UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :
                              :
        vs.                   :      CRIM. NO. 3:03CR160(AHN)
                              :
THEODORE WELLS                :
                              :

MOTION FOR APPOINTMENT OF COUNSEL

I am seeking appointment of counsel under 18 USC 3006A (a)(2)(B) to assist me in seeking relief under 28 USC 2255 ("2255").  I am filing this motion pro se.

I am unable to pay for an attorney and offer the following in support:  I am incarcerated and have been for over 4 years. I have no significant assets.  My most recent employment was in 2001 and I have had no income since.  Friends loan me about $100 per month and as of 5/23/07 I have $8.94 in my prison account.

Hodge v. Police Officers, 802 F.2d 58, 61-62 (2nd Cir. 1986) explains, "In deciding whether to appoint counsel...the district judge should first determine whether the indigent's position seems likely to be of substance.  If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special rea-son in that case why appointment of counsel would be more likely to lead to a just determination."  Because I am seeking appoint-ment of counsel prior to filing my 2255 motion, I take this to mean that I must show that my 2255 motion will have some sub-stance and that there is just cause to appoint counsel at this

2

early stage.  I will begin by explaining why I need early counsel as that will provide the foundation for a showing of substance.

Dalli v. U.S., 491 F.2d 758, 761 (2nd Cir. 1974) says that I "must set forth specific facts which [I am] in a position to establish by competent evidence" in my 2255 motion.  However, I have been unable to obtain the information I need to accomplish this. In order to explain the information I need, I offer the following summary of what I intend to present in my 2255 motion.

## INEFFECTIVENESS SUMMARY

My lawyer, Mr. Belsky, failed to obtain from me all the legally relevant information I had, failed to keep me informed of important developments in my case, and failed to make a substantial investigation of my defense.  Based on those failures, he told me that I would almost certainly lose at trial.  I wanted to go to trial but he convinced me that all that would get me would be a longer prison term.  Thus, though I did not commit the crimes, I pled guilty.  Had he not failed in those basic duties, he would have advised me that I had a reasonable chance at trial and then I would not have pled guilty.

Mr. Belsky did not adequately prepare for my sentencing.  He did not inform himself of the relevant Guidelines, with the result that my sentence was based on an offense level 2 higher than it should have been.  Because of his consultative and investigatory failures, he was compelled to let stand the extremely negative picture of me that the Court based its sentence on.  He had no facts to counter the upward departure nor to support any downward departures.  At my sentencing, he failed to point out several

3

errors that the Court surely would have corrected, some of which
resulted in my possibly getting a harsher sentence. Some of them
were plain errors, yet he did not bring them up on appeal.

My speedy trial rights, under the Constitution and the Speedy
Trial Act, were violated. Mr. Belsky did not tell me nor did he
assert them on my behalf. Had he told me, I definitely would have
insisted that he move for dismissal which, given the Constitutional
violation, likely would have been granted with prejudice.

Aside from the ineffectiveness, there were other areas where
Mr. Belsky failed to act on my behalf. He lied to me to try to
get me to plead based on the first plea agreement; had he been
successful, I could have got 14 years instead of the 10 I ended
up with. (He also lied to the Court about that plea.) The Gov-
ernment failed to do their competency examination within the statu-
tory 30 days; though I demanded that he do something about it, he
did nothing, which meant that I was stuck for an additional 3 months.
I desperately needed psychological help and I asked him to get me
that help. He said he would try but he did nothing. He made only
a cursory effort to get me pretrial release. This is egregious
in that, had he succeeded, I could have got the help that I needed.
Furthermore, he had 3 different ways he could have tried. He
could have tried for bail. He could have asked for my release
based on 18 USC 3164. He could have asserted that my prolonged
confinement violated due process. All of these illustrate that he
was not acting as counsel for my defense.

4

## THE FACT PROBLEM

If I were to write my 2255 motion today, there would be many important facts that I either couldn't describe with specificity or that I wouldn't be in a position to establish by competent evidence. I had actually started writing that motion and, to illustrate my problems, I present the following section from my effort.

"The prosecution alleged that I (quoting from the prosecution's brief for my revised appeal), 'targeted vulnerable young girls by stalking Internet chat rooms devoted to troubled teens'. I, 'communicated via the Internet with a 15-year-old girl'. Then, 'another young girl whom defendant met on an Internet site catering to troubled teens'. And, 'yet another fifteen-year-old girl whom defendant met in a teen Internet chat room....catering to young people suffering from depression'. Finally, 'defendant was once again prowling the Internet in a chat room frequented by young people dealing with difficult personal issues and seeking peer support'.

"The first girl (variously named as AR, Amanda, and JD) was browsing Yahoo's screen name directory where she found my screen name, depressed_and_hurting, and sent it a private message. We did not meet in a chat room. I met the second 'girl' (who is not named and who was not a minor) in the depression room of the Undernet IRC network. I don't remember my meeting with the third girl (Dominique) but it was not in a teen depression room; Yahoo had no such room. The Yahoo depression room was in the Health and Wellness category, not the Teen category. I met the fourth girl (LF or LB) in that depression room. Both the chat rooms I mentioned were open to anyone who wanted to come in; however, most of the people in those rooms were adult.

"Mr. Belsky could have found out where I met them by looking at the evidence or by interviewing them.  Then he could have checked with the Undernet and Yahoo to find out who used those rooms.  He did not do this.

"Depression, not teens, was the common factor.  A proper investigation would have shown that and would have shown that I had a very good reason to be in depression chat rooms."

There is, unfortunately, remarkably little information available in prison on how to actually write a 2255 motion.  I read the Rules on 2255 motions and saw an earlier version that said I need only present a summary of the facts.  Were that so, I could have simply presented something like my "Ineffectiveness Summary" and later proceedings would have provided the details. Further reading convinced me that that would have been dismissed as conclusory.  The above quote exemplifies what I thought I needed to write.  Then I read Dalli.

The first two paragraphs stack up fairly well by the standard of Dalli.  They allege specific facts and I can establish them through legal records, inquiries to Internet providers, and inter-views with the people mentioned.  The third paragraph, however, is a problem.  It alleges a specific fact, that Mr. Belsky did not investigate the chat rooms.  However, I cannot presently provide evidence of that.  I believe it to be true, based on the fact that he never so much as hinted that he had looked into the chat rooms. That evidence would have to come from Mr. Belsky himself and I am in no position to get it from him.

I have tried.  As I will detail shortly, I have made repeated unsuccessful attempts to obtain my case records and it would be

those records that would support - or contradict - my claim.

The final assertion of the last paragraph refers to an earlier discussion where I point out Mr. Belsky's failure to properly investigate my mental problems and history. I said, among other things, that he could have obtained lots of information from my mother, with whom he was in contact. Neither he nor my mother ever mentioned any discussion of my childhood so I assume there wasn't any. Without my case records, I am not in a position to present evidence on this as my mother is now dead. My mother likely could have directed him to people and records that would have further supported my defense. Being incarcerated, I am in no position to track them down.

I have been in online support groups since 1991 and I wrote a lot of e-mail and other messages, all of which I saved. Mr. Belsky could not have looked for them since I didn't give him my passwords (he never asked). But I have another problem. Although I certainly have hundreds of potentially relevant messages, I can't say what the specific content of them would be. For example, I believe that I mentioned that I had tried to kill myself when I was 12, that my memory of my life before I was 10 is largely blank, and that I have multiple personalities. But I have no access to my computer, so I can't be certain of what is there - or whether I can find anything; I have tens of thousands of messages saved.

I believe I need, at a minimum, the complete records of my case. Unfortunately, I have not been able to get them. I wrote Mr. Dennis (Mr. Belsky's boss) on 12/28/06 asking for my records. In response, I was sent the pleadings in my case, but not all of them. On 1/29/07, I sent another request. I got some additional

pleadings but the bulk of my request was ignored. On 3/1/07, I sent a third request which was completely ignored. On 4/19/07, I wrote to Judge Nevas asking him to direct the Public Defender to send me all my records. So far, that has not been acknowledged.

Nor is this my only difficulty. To support my claim that I have mental problems, I have attempted to obtain my prison records via the FOIA. I wrote on 1/8/07 and again on 2/22/07. I got no response. On 4/6/07, I wrote to the appeals address; they told me that my only recourse was judicial.

I wrote the Clerk of the Connecticut District Court on 2/5/07, asking for my docket and a few other items. I got no response. I wrote again on 3/7/07, again with no response.

In an attempt to get some of the records that the Public Defender denied me, I sent a FOIA request for my prosecutor's records, on 4/20/07. More than 20 working days have passed with no response but that may be due to mail delays.

(I seem to have lost my first request to the Public Defender and my second request to the Clerk of the Court but I have included copies of the rest with this motion.)

I need access to my computer. I can't delegate this to someone else because of the volume of the data to sift through and because there is no reasonable way to specify what to look for. I believe that only a lawyer could arrange this.

To top it all off, I am becoming squeezed by the filing deadline. I must file my 2255 motion by 11/28/07, give or take a day. My plan is to file by 11/1/07 to avoid last minute problems. I anticipate that it will take me a month to write my draft and another month to type the motion. That leaves me 3 months to

8

collect and organize the information - most of which I don't have
and which might take months to get.  A lawyer could expedite the
collection of that information.

Although my specific need is for a lawyer to help me obtain
information, that lawyer could assist me in other ways if the Court
deems it proper.  It is also possible that my need could be met by
a non-lawyer provided pursuant to 18 USC 3006A(e)(1).

## THE SUBSTANCE

I expect that the Court will not appoint a lawyer unless I
make some showing that my 2255 motion will have merit.  One major
part of that motion is the claim that Mr. Belsky failed to ade-
quately consult and investigate.  Other than by presenting the
entire discussion that I have already written and which I excerpted
earlier, I can't offer much to show merit in this claim.  It's
fairly long (I estimate 15 pages) but I will type it up and submit
it if the Court wants it.  I can do better with some other claims.

## SENTENCING FAILURES

In 2003, Mr. Belsky had me sign a plea agreement whose Guide-
lines calculation did not include 4B1.5.  That was a major error,
see U.S. v. Day, 969 F.2d 39 (3rd Cir. 1992) and U.S. v. McCoy,
215 F.3d 102 (D.D.C. 2000) (Familiarity with the structure and
basic content of the Guidelines is required for effectiveness.)
But then in the 2004 plea agreement, with which I entered my plea,
he omitted 2A3.2(b)(4), which was required.  Not doing that in the
plea agreement might have been tactical but then he would have
brought it up at sentencing.  He did not.  Nor on appeal.  That

9

would have reduced my offense level by 1. It also would have allowed consideration of 2A4.1(b)(4)(C) (reducing the offense level by 1 for a kidnapping of less than 24 hours). I met LF around 4 PM Saturday; we left my home to meet her friends early Sunday afternoon.

Mr. Belsky did not point out any of the errors in my hearing. The Court upwardly departed but did not specify the extent of the departure. I wasn't allowed to speak before my sentence was pronounced. I should have been given notice of 3 of the special conditions of supervised release. 2 of those conditions were, in part, occupational restrictions (because they would have required notifying my employer). The relevant findings were not made.

All of the above errors were plain errors and (with the exception of the missed allocution which was cured because the prosecution brought it to the attention of the Court) could have been brought up on appeal. Mr. Belsky did not do that.

### SPEEDY TRIAL ACT FAILURE

My rights under the Speedy Trial Act were violated but Mr. Belsky did nothing about it. My most government-friendly calculation has the following nonexcluded periods:

|  |  |  |  |
|---|---|---|---|
| 6/13/03 | - | 7/10/03 | 28 days |
| 7/16/03 | - | 8/ 4/03 | 20 days |
| 10/29/03 | | | 1 day |
| 11/24/03 | | | 1 day |
| 11/26/03 | - | 12/11/03 | 16 days |
| 7/30/04 | - | 8/12/04 | 14 days |
| | | | 80 days total |

10

(The 17 days starting on 11/24/03 are not apparent from the docket. They occur because the government did not finish transporting me to the competency examination until 12/11/03 and only 10 of the transport days are excludable. 18 USC 3161(h)(1)(H).)

## CONSTITUTIONAL SPEEDY TRIAL FAILURE

My Constitutional speedy trial right was also violated. The 15 months from my arrest to my plea is presumptively prejudicial. U.S. v. Vassell, 970 F.2d 1162, 1164 (2nd Cir. 1992) (A delay of over 8 months is presumptively prejudicial.) I have split the delays into the following periods:

| | | | |
|---|---|---|---|
| 5/13/03 - | 7/10/03 | 59 days | neutral time |
| 7/11/03 - | 10/28/03 | 110 days | defense requests |
| 10/29/03 - | 11/ 4/03 | 7 days | neutral time |
| 11/ 5/03 - | 1/16/04 | 73 days | competency evaluation |
| 1/17/04 - | 7/28/04 | 194 days | see below |
| 7/29/04 - | 8/12/04 | 15 days | neutral time |
| 8/13/04 - | 8/25/04 | 13 days | defense requests |
| | | 471 days | total |

81 days were no one's responsibility. 123 days were mine. As I will discuss below, the 73 days for the competency evaluation were spent in good faith but their necessity came from my lawyer's misconduct. They should not count against me and, given that my lawyer is an officer of the Court, they really ought to count against the government. As for the remaining 194 days, those were spent because of government neglect and misconduct.

I have had mental problems all my life. I could provide extensive documentation with my computer files. In addition,

11

various people can attest that I at least mentioned to them, in the mid 90's, that I have depression and multiple personalities. I have included a couple of pages from my prison medical records. The key items are the statement that my history is consistent with dissociative identity spectrum disorder and that the working diagnosis includes recurrent major depression and dissociative disorder, not otherwise specified ("DDNOS"). Dissociative identity disorder ("DID") is the official name for what is popularly called multiple personalities. My own disorder is similar to DID; however, Dr. Gariety did not find evidence of reversible amnesia, a significant feature of DID. Thus my diagnosis is DDNOS, which is given when one has most but not all the features of a specific disorder.

I wasn't in good shape even before I was arrested. Not only did my arrest create the usual traumas, it subjected me to stresses that intensified my mental problems and cut me off from all my coping resources. I was in very bad shape while I was in Bridgeport. I tried to get help from the prison, without success. I asked Mr. Belsky to get me help but he did nothing.

Mr. Belsky convinced me to plead guilty. Then he came in and told me that he had just discovered 4B1.5 and that, if it were applied, I'd get 14 years instead of 3.5. He suggested that I might just go ahead with the plea and hope no one noticed. After some discussions, in which he assured me no one was likely to notice, I agreed. Just minutes before I was to enter my plea, he found out that someone had noticed. I then refused to enter the plea. He then said, "I will fall on my sword" and, at sentencing, tell the Court that he had not advised me of 4B1.5 before he had me sign the plea. He told me that the Court might then sentence

12

me without it.  Not even my near total legal ignorance at that time
let me believe that.  I told him no.

Mr. Belsky hadn't got me bail.  Nor the help I so badly needed.
The 4B1.5 mess made me feel that his real goal was to get me sent-
enced with as little effort as possible.  I felt profoundly help-
less and abandoned and betrayed.  I became suicidally depressed.  I
took to my bed, stopped eating, and waited to die.

By the time of the arraignment on the superseding indictment,
I had started to pull out of the worst of my depression but the Court
noticed that I wasn't doing well and ordered a competency evaluation.

The BOP should have sent me to FMC Devens, as the closest
suitable facility.  18 USC 4247(b).  It should have taken no more
than 10 days to get me there.  18 USC 3161(h)(1)(H).  Instead, they
sent me to MDC Los Angeles and took about a month to do it.  They
had 30 days to do the examination.  18 USC 4247(b).  It should have
been done by mid January.  I didn't leave there until mid April.

When I got to MDC Los Angeles, I was placed in an upper bunk.
That is a violation of BOP policy; I am legally blind and climbing
is hazardous.  A week later, they corrected their failure by moving
me into a cell with a man who collected his feces and stored them
under the bunk.  In the 5 weeks he was there, those feces were re-
moved twice; one of those times, I was ordered to do the removal.

Immediately after I arrived, I was informed that I would have
to discuss my case during the examination.  Mr. Belsky had said
nothing of this to me so I told them I would not do that until I
had talked to him.  They said they would arrange a call.  That never
happened.  Though I asked repeatedly, they also never gave me my
phone access code and I couldn't call him on the regular prison

phone either.

When the 30 days for the examination were up and nothing had happened, I picked up a special phone that connected directly to the Los Angeles Public Defender hoping they would pass a message to Mr. Belsky. To my surprise, they were able to connect me to him. I emphatically told him that they had not started the examination, that, as they had used up their time, I would not allow them to examine me, and that I wanted to be returned to Connecticut. I made several calls, all saying the same thing. He told me he could do nothing.

Although I was doing fairly well when I got to MDC Los Angeles, my condition got worse over time. The unexplained failure to start the examination didn't help. Nor did being prevented from contacting my lawyer. My cellmate's habits were a major factor. Shortly before he left, I walked into my cell and saw him masturbating. That triggered a nasty flashback, the first of many I had concerning the abuse I suffered when I was 7; it featured feces and a man masturbating.

Over the next couple of weeks, things got really bad for me. The prison finally noticed. All they did was move me to a real hospital for a month, where I was kept chained to a bed. At no time was I offered treatment. Shortly after they brought me back from the hospital, they finally tried to examine me. I refused to cooperate. A month later, the same thing. Finally, they returned me to Connecticut. During that final month plus, I had problems bad enough for the prison to notice. All they did was lock me up for a few days. That happened several times.

I was really messed up when I got back to Connecticut. All

14

they did was lock me in a cell. No treatment. When Mr. Belsky
came to see me, I was barely coherent. All I remember from that
conversation was begging for help and his promise to see what he
could do. He said he would be back every week or so but it was over
2 months before I saw him again and that was only for a few minutes
during the second competency examination. It was over a month more
before I saw him at any length. I enclose a copy of a 4/16/04
motion to continue that Mr. Belsky filed. That motion says he was
going on vacation so he knew he wasn't going to be available to find
me help. Contrary to that motion, he never discussed it with me nor
did I receive the Speedy Trial waiver it said he would be sending
to me. Mr. Belsky basically abandoned me from mid April to mid July
- really from mid January.

In the middle of May the flashbacks got really bad. I took to
pacing in my cell with a blanket over my head. In the middle of
this, some men came into my cell, stripped me naked, and draped me
over the bed. They took my glasses and, three years later, I still
don't have glasses. Anyway, I almost completely dissociated; what
was left of me was largely a vegetable. I neither ate, nor drank,
nor anything else, other than shifting around on my mattress. When
they could no longer measure my blood pressure, they sent me to a
real hospital. After a few days there, I was returned to prison,
still a vegetable. A few days later, they moved me to a prison
hospital where I was kept on an IV for a month or so.

All this time, they did nothing but the minimum needed to keep
me alive, and they came close to blowing that too. There wasn't
anything I could do. I was dissociated with nothing to pull me
out. However, the prison hospital cells had TV's in them. One

day they moved me to a cell with the TV left on. Eventually, that got my attention and I started working my way back to reality. I started eating - so they moved me back to an empty, unstimulating, cell. I stopped eating again and had to work to make up the ground I had lost. Meanwhile, they decided to force medicate me. They attribute my recovery to those medications. I could have told them otherwise had they asked. They didn't. No one in the prisons, nor Mr. Belsky, ever asked me what was going on all those months.

In summary, without Mr. Belsky's flagrantly unethical handling of the plea agreement, there would have been no need for a competency evaluation. And without his later unethical behavior, the mal-practice of the prison mental health staffs, and the egregious violation of statutory time limits, the hearing the Court scheduled for 1/16/04 would have not been postponed until 7/28/04.

Classifying the competency examination is difficult. On the one hand, there was a genuine question of whether I was competent. On the other, that question only arose because of various government agents' wrongdoing. For the sake of argument, I will treat it as neutral time. Then, 4 months of the delay is mine. 5 is no one's. And 6 were the government's. Throw in the fact that my rights under the Speedy Trial Act were violated and it is clear that, on balance, the government was much more responsible for the delay than I was.

I am, of course, describing the factors in Barker v. Wingo, 407 U.S. 514, 33 L.Ed.2d 101, 92 S.Ct. 2182 (1971). The next factor is whether I asserted my speedy trial right. I didn't but, as is noted in Barker, an ineffective counsel excuses that. Mr. Belsky failed in his duty to tell me of this obvious violation. Especially in light of my repeated demands to Mr. Belsky to get me returned to

16

Connecticut.

Barker, 33 L.Ed.2d 101, 118 identifies 3 elements of prejudice: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the defense might be impaired. Moore v. Arizona, 414 U.S. 25, 38 L.Ed.2d 183, 186, 94 S.Ct. 188 (1973) adds interference with the defendant's liberty, disruption of employment, draining of financial resources, public obloquy, and anxiety in his family and friends. U.S. v. Roberts, 515 F.2d 642, 645 (2nd Cir. 1975) says, "The Sixth Amendment's guarantee of a speedy trial gives recognition to an accused's significant stakes - psychological, physical and financial - in the prompt termination of a proceeding which may ultimately deprive him of life, liberty or property." It also holds that "the speedy trial clause applies with full force at least until a guilty plea has been entered by the defendant and accepted by the court." U.S. v. Dreyer, 533 F.2d 112 (3rd Cir. 1976) describes a case where a 2½ year delay caused a severe mental disturbance that provided prejudice sufficient for dismissal.

I spent 15 months locked up, with serious mental problems, and no meaningful treatment. Being locked up cut me off from friends, books, computers, support groups, all of which I had used to help me cope with my problems. I was left in limbo, largely ignored by everyone, for 7 months. In a partially overlapping 7 months, I was confined to a room with little or no recreation time. In all that time, I was allowed outdoors for about 3 hours. I was force medicated without due process. Sell v. U.S., 539 U.S. 166, 156 L.Ed.2d 197, 123 S.Ct. 2174 (2003).

At the time of my arrest, I was trying to start a small business. That was destroyed. My home was foreclosed on. Before that

happened, some of my friends collected some of my possessions.
The police have my computers and some miscellanea. Everything
else was lost.

My mother and I had a very strained relationship. But the
circumstances might have brought us back together - we hadn't
talked for years - because I finally spoke to her on the phone.
Then I was abandoned in Los Angeles. By the time I could use a
phone, she was dying of cancer. But I didn't know. She wasn't
anywhere I could call to find out. I was not there for her ill-
ness. I was not there for her death. I was not there for her
funeral. I knew nothing until I was called after her death.

I've already mentioned that my mother's death meant that
much information about my childhood has been lost. That infor-
mation would have provided strong support for the origin and na-
ture of my psychological problems. Those problems are at the root
of my actions and, without that support, it would be more diffi-
cult to explain my actions as other than maliciously criminal.
(I also note that Mr. Belsky asked for a diminished capacity
downward departure but provided no support for it - support he
could have got from my mother.)

Some of the evidence that would have helped my defense was
on a computer that I rented at an Internet provider. Over the
years I provided personal support and Internet services to many
people. There were software I wrote, databases, and log files
related to that on that computer. Only one of those services was
mentioned to the Court, in the defendant's sentencing memo and
in the letters written on my behalf. What wasn't mentioned was
that over 30,000 people used it, that it allowed anonymous contact

with The Samaritans (who run a crisis line and have an email ser-
vice too), and that I spent some 2 man-months a year from 1992 on
it. Part of my defense is that I spent a lot of time helping many
people and my involvement with those girls was just another aspect
of my helping people. (Mr. Belsky knew of my services but didn't
look into them. That also would have been worth considering as a
possible ground for a charitable services downward departure.)
Until the other day, I believed this evidence to have been lost.
I got a letter that hinted otherwise; I am awaiting further infor-
mation.

A major part of my defense is showing that LF lied. On Sunday
morning, I left LF alone while I went to get groceries. She didn't
mention this (in any of the documents I have), possibly because
she then would have had to explain why she didn't call someone or
just leave. I am fairly sure I paid for the groceries with a credit
card; I don't know for sure because Mr. Belsky never checked. If I
didn't, witnesses or store records would have been necessary to con-
firm that I went there. The passage of time very likely resulted
in the loss of that evidence.

Later, I handed LF my cell phone so that she could call her
friend. I talked to her while she was talking on the phone to her
friend and then I spoke to her friend's mother. LF tells the story
differently. She claims I was in the shower when she placed the
call. Her friend and his mother might have remembered enough details
to show the truth. The passage of time surely would have made it
harder to remember those details. Not really relevant here, but the
fact that the call was placed on my cell leads to the question: why,
if I was in the shower, didn't she just take my cell and leave before

placing the call?  These things were among those that Mr. Belsky did
not check out.

Another part of my defense is to establish a motivation for
LF's actions.  I say that LF is one of those people that get a sense
of power and pleasure from manipulating others.  Her actions, from
the lies she told in the chat room to the claim that I abused her,
were intended as manipulation.  When someone believes and acts on
one's lies, that is power.  While LF admitted to at least one of
her lies in the chat room, logs of that conversation would have
shown the full extent of the manipulation.  Such logs might have
been kept by Yahoo but it is unlikely they kept them more than a
year.  I also might have had them on my computer but Mr. Belsky
didn't check anywhere as far as I know.

At the bus station, LF followed me out to meet her friends.
Then she disappeared down the street.  I'm sure she enjoyed watch-
ing us all frantically searching for her.  Support for this recol-
lection would have had to come from the memories of her friends.
They might have remembered that search.  Less likely, the conver-
sation in the car: I tried to warn them not to let LF return to
an abusive situation but she kept cutting me off.  Time would not
have helped them remember those details.

Roberts is structurally similar to my case.  In both, a plea
of guilty was contemplated.  The delay there was 14 months; mine
was 15 months.  In Roberts, the prosecution held off accepting his
plea because it was to be his reward for helping in another trial.
That trial was seriously delayed because of the unavailability of
the judge and the prosecution did nothing to get the case reassigned,
even though other of the judge's cases had been reassigned.  The

delays in my case came from the government's violation of 18 USC
4247(b), unreasonable delay transporting me to the competency exam-
ination, Mr. Belsky's inaction, and the unavailability of meaningful
mental health treatment.

In both cases, the speedy trial right was not properly asserted.
Robert's tardiness was excused due to his likely ignorance of the
oncoming prejudice and that asserting that right might well have
resulted in the loss of the very favorable plea agreement. In my
case, my lawyer failed in his duty to protect this right.

Roberts and I both suffered serious personal prejudice. He
lost the opportunity for probation. I spent 15 months in Hell,
along with various other harms. In addition, my defense was at
least somewhat prejudiced by the delay.


### PRETRIAL RELEASE FAILURE

I asked Mr. Belsky to contact my mother to see if she would
help with bail. She was still living in our family home but had
transferred the deed to my brother. He made no attempt to contact
my brother. My brother has since told me that he would have had no
problem putting up the house and my mother had no problem with my
staying with her.

I earlier listed the post-arraignment Speedy Trial Act periods.
Here are those pre-arraignment:

         5/14/03 -  5/18/03    5 days
         5/23/03 -  5/28/03    6 days
         5/30/03 -  6/11/03   13 days
                              24 days

That plus the 80 post-arraignment days gives 104 days.  I

21

should have been released after 90 days.  18 USC 3164(c).

I only recently discovered that there are due process limits on pretrial incarceration.  What I have seen strongly suggests that 15 months, where government neglect and misconduct contributed to those 15 months, exceeds those limits.  Add that to the Speedy Trial Act violation and I surely should have been released.


CONCLUSION

For all of the above reasons, I request of the Court the appointment of counsel to assist me in obtaining the information I need to prepare my 2255 motion and/or any other relief the Court deems proper.  Because of the conflict of my interest with the Public Defender's, resulting from their denial of my case records and Mr. Belsky's ineffectiveness, I request that anyone who is appointed to assist me not be associated with the Public Defender.


Respectfully submitted this _4th_ day of _June_, 2007.


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.


Theodore Wells

12561-050

FMC Devens

P.O. Box 879

Ayer, MA 01432